Last case for the morning is United States v. Wagner, 19-3068. Good morning and may it please the court. My name is Trevor Riddle. I represent the appellant, Wesley Wagner. Mr. Wagner's appeal raises six issues for this court to consider, but in my short time this morning, I would like to address the last two of those issues. Issues five and six relating to the court's sustaining the government's hearsay objection at trial and to the question of the sufficiency of the evidence. Operation Pacifier was an international investigation conducted by the FBI to identify, locate, and ultimately prosecute individuals who accessed a website known as Playpen. The FBI employed a sophisticated computer virus to infect the computers of individuals who accessed that particular website. That virus caused the accessing computers, the computers of these individuals, to expose certain identifying information. Most importantly, the internet protocol address or the IP address of the accessing computer. One of the thousands of IP addresses snagged by the FBI's computer virus led the agency to Mr. Wagner's residence in White City, Kansas, where in the early morning hours of September 17, 2015, agents executed a search warrant and interrogated Mr. Wagner. While the FBI's sophisticated computer virus was able to reach out to computers all over the world and search for certain identifying information, the virus or NIT as it became known, the Network Investigative Technique, was unable to uncover the most important bit of information, the identity of the person at the controls of the computer that accessed the Playpen website. This is true of all of the thousands of computers infected by the FBI's virus, including the one that pinged back to the IP address related to Mr. Wagner's residence. By the time then that Mr. Wagner's case came to trial, the question for the jury was actually fairly simple. It was a question of knowledge. Did Mr. Wagner knowingly receive child pornography, and did Mr. Wagner knowingly possess child pornography? The government's case was focused on proving the element of knowledge, and the defense, of course, was focused on exposing the reasonable doubt on this particular element. Unfortunately, a seemingly minor evidentiary ruling by the trial court cut the legs out from under the defense's efforts to expose the government's lack of evidence on the issue of knowledge. During its case in chief, the government introduced into evidence an audio recording of Mr. Wagner's September 17, 2015 interrogation, and with the exception of a few minor agreed upon redactions, the recording constituted a full record of the questions asked of Mr. Wagner by the federal agents, and Mr. Wagner's response to those questions. The government played this recording then for the jury. So the jury heard everything that is arguably relevant already when they heard the audio, right? The recording, yes. The jury heard the recording after it was introduced during the trial. The government then published the recording, and it was played in court for the jury. And I assume you're segwaying into the hearsay issue. Correct, Your Honor. And so on the colloquy with regard to the hearsay issue, when there is the discussion with both counsel, what was the reason for the relevance of the cross-examination question about what Mr. Wagner had told the agents? What was the relevance that was given? It was the same reason given that the government chose after introducing the statements to then not move on to a separate subject or to release that particular witness, but to then ask additional questions related specifically to statements made during the interrogation to clarify or to bring to the jury's attention certain aspects of that statement. It was about a 48-minute recording. Well, let me ask you this because, again, I'm not trying to argue with you, but this is, I'll just tell you, this is my hang-up on your hearsay issues. If I'm off, you just tell me. So there is the colloquy, and then the judge asks, well, what is the relevance of these questions when there is already discussion about what had taken place, what had been said during the interview with the agents? And defense counsel says, quote, it's relevant to the fact that just to make sure that is, in fact, what he told her, end quote, on page 521 of the appendix. Well, if I'm the district judge, I'm thinking, well, that's not very relevant. Nobody's questioning what Mr. Wagner had said. The jury heard the audio. So if you're just eliciting cross-examination to show, well, he really said that he has, the context is PTSD, that if he really has PTSD, he told the agents that. Well, the jury already heard him say that. Nobody questions the veracity of the proffer that had been given. As trial counsel, I often review the transcript of statements that I make during a trial, and I'm shocked at things that I thought I said something, and then when I hear it later, I think, did I really say that? I will acknowledge to this court that that was not a very eloquent way of stating the rationale for the ability to ask the agent questions related to the statement. However, the trial judge didn't sustain the objection based on the fact that the questions that counsel may ask were not relevant. The trial judge sustained that objection on the fact that it was hearsay. And the fact of the matter is it was not hearsay. That really gets to the heart of the argument here. If I'm not mistaken, related one says hearsay is an out-of-court statement offered to prove the truth of the matter asserted, and the truth of the matter asserted here is that Bishop Wagner had PTSD. And so why is it, whether you look at it as a Rule 402 issue or a hearsay issue, what difference does it make whether he said he had PTSD? I mean, PTSD was only one of the aspects that would have been covered. And the best way that I as trial counsel at the time could try to ask those questions, if you look at the record of the trial, after the hearsay objection was sustained, I asked the case agent a series of questions about questions that you asked Mr. Wagner about this subject, and Mr. Wagner answered. And we didn't get into Mr. Wagner's answers. We just kind of said to try to get out the subject matter that would have been the subject of cross-examination. PTSD was one of those, but it was also about who had access to the computer and some of the other things. So maybe just to highlight what the government was allowed to ask on direct examination and what defense counsel was not allowed to ask on cross-examination. I know we're using a lot of time on this, but the audio is already in evidence, right? And you wanted to ask about statements that were made that are already in evidence. I suppose we can have a debate over whether there's a technical hearsay issue here, but it's already in. But how can you show, if there really was an error in the ruling, that it affected your client's substantial rights under Rule 103, if it's in, you can argue it in your closing argument because it's in evidence. Why are we spending so much time on this issue? And maybe I can address that. Maybe I can address both questions here by just kind of getting to the heart of what the government asked  And to your question, Judge Matheson, particularly, that's a good point. And on a cold record, sometimes that seems the case. You know, when you're in trial, though, I would just say this. The government saw that there was some purpose in asking follow-up questions. For, again, the government introduced the entire recording, but then didn't say, well, thank you, Agent Jones, the particular witness that this recording came in through. Thank you, Agent Jones, for your testimony. We're done. Or move on to another topic. The government then asked specific questions about statements Mr. Wagner made on that recording. For instance, the government was allowed to highlight to the jury that Mr. Wagner never complained of or made reference to any problems with the family laptop computer. But because of the court's ruling on the hearsay objection, defense counsel was prohibited from clarifying with Agent Jones that Mr. Wagner noted specifically that that computer had no password protection and was accessible to anybody in the home through a single user account. And that while he and his wife were two of the people who used that computer, the couple had had houseguests in their home throughout the years, and including in 2013 had people who had lived with them. And so there was that computer without a password and a single user account was accessible not only to Mr. Wagner and his wife, but anybody who may have been in the house. Well, vis-a-vis the hearsay rule, how were you situated similarly to the government? I mean, the whole point is there are admissions of a party opponent, and the government was situated under the hearsay rule to explore those admissions because they were exempted from the hearsay rule. That didn't apply to you. And that's the interesting question here because I would agree with that analysis if what had happened is the government had only introduced certain statements of Mr. Wagner, for instance, the statement about not having issues with the computer, or the government had only introduced Mr. Wagner's statements about struggling previously with a pornography addiction, or if the government had only introduced Mr. Wagner's statements about the day before agents arrived at his home searching for pornography. If the government had only introduced those statements and had not introduced the statements that defense counsel then tried to ask about in cross-examination, much like the Zamudio, I think, the Zamudio case. Well, counsel, is this kind of an opening-of-the-door argument, the fact that the government got it in, then you should be able to ask about it? Is that your argument? It's not really an opening-of-the-door argument. It's the fact that it's not hearsay. The statements have already been introduced by the government. It's hearsay if the party is offering it into evidence to prove the truth of the matter asserted. Defense counsel didn't offer those statements. They were already in evidence. The recording was already in evidence. But you weren't impeaching with the statements, though. Why weren't you offering for the truth of the matter asserted? You said, did they say that? And the clear inference of that was trying to establish the truth of it. So you were trying to introduce it for the truth of the matter asserted. What other purpose would there be in that context? And I understand that my argument for this court is that I was not introducing those statements. They were already introduced. And that gets to my point that, yes, the statements have been introduced. They've been introduced by a party who had, under the hearsay rule, the permission to introduce those statements. Because otherwise they would be hearsay, but for the rule which makes them admissions of a party opponent. So when you get up, you are not using them as admissions of a party opponent. And, therefore, one has to say, why are you using them? Number one, whether they're relevant. But, number two, why are you using them? And if you're using them to prove the truth of the matter asserted, then how are you similarly situated to the government under the hearsay rule? And, again, I would point to the distinction here, really, in the case. The only case that either party was able to find this was the government was the Zamudio case. In that case where there was an issue here with what statements came in. And in that case, it's a little bit convoluted. But, really, what happened in that case was a redacted version of the defendant's statements came into evidence. And, in that case, the court ruled that it was proper to prevent defense counsel from asking questions on cross-examinations about the completeness of the statements. Because the aspects of the statements that defense counsel were asking about were not admitted into evidence. But, here, the statements had already been admitted into evidence and had been played for the jury. This really goes to, I think, Judge Mathison, your question. That is, what's the purpose of it? Well, in the opening of the door, the government introduced those statements. They didn't choose to try to redact the recording in any way. They introduced the entirety of the statements. At that point, that becomes proper cross-examination. Okay. And to be clear, then, proper cross-examination, what was your theory of cross-examination? Why were you using those statements? Because, much like the government attempted to use those statements to frame Mr. Wagner's interrogation of the statements he made in an inculpatory manner, defense counsel was attempting to counter those statements and show that Mr. Wagner's statements were, in fact, exculpatory. And you wanted the jury to accept the truth of those exculpatory statements? I wanted the jury to hear those and be directly pointed to those statements. Yes, Your Honor. And it's important to note, I know I'm running out of time. Counsel, I've just got to ask you a question because I came in wanting a clarification. This is on a different issue, on the statements issue. When did the interrogation of Mr. Wagner become custodial? I would argue to the court that it was custodial almost from the very beginning. It was at 7 o'clock in the morning when six armed law enforcement agents arrived at Mr. Wagner's house. Mr. Wagner's house, while having a residential address, as the record shows, was on the edge of town. It was very rural in a setting. It had a very long driveway, as the case agent testified to in both the motions hearing and at trial. And there were six agents in at least two cars, if not more, who pulled up into the driveway, confronted Mr. Wagner, who didn't have his shirt on at the time, at 7 a.m. in the morning. Now, I agree they told Mr. Wagner he was free to leave, and that's one of the factors that's against him. I just wanted to know if your position was that it was custodial from the get-go or whether it became custodial during the course of the interview. And I'm understanding your argument to be the latter. That's correct, Your Honor. I would argue that it was custodial from the very beginning. The former. Or the former. From the very beginning. Okay. And I recognize I'm way over time, but thank you, Your Honor. Thank you, counsel. Good morning, Your Honors. Brian Clark on behalf of the United States. And with me at counsel table is Steve McAllister, the United States Attorney for the District of Kansas. May it please the court. I'd like to start first with the hearsay objection, since that's where Mr. Riddle started. And I'd like to start from first principles, as you all did. Hearsay is defined as an out-of-court statement offered for the truth of the matter asserted. Here, Mr. Riddle sought to elicit statements by Mr. Wagner from Agent Jones when she was on the stand and to offer those for the truth of the matter asserted. And under that test, this was hearsay. Now, even if Judge Crabtree was incorrect in sustaining the government's objection, we say that that error, if there was one, is harmless. It didn't affect Mr. Wagner's substantial rights. And there are several reasons for that. Could I just ask on the hearsay? Yeah. If the defendant had offered the out-of-court statements in the first instance for the truth of the matter asserted and had argued that, well, it was the defendant who made the statement, it's a party admission, and then there would be objection, well, it has to be offered against a party opponent. The party making the statement doesn't get to rely on that rule. But that isn't what happened. What happened here is the government introduces the statements and they come in. And once they're in, why is there a valid hearsay objection at that point? Do you have any cases that have addressed that sequence, that scenario? Because it seems that once evidence is in, it's sort of fair game. Sure. And that gets to the opening of the door question that I think you posed. I didn't find any cases precisely on that point from this circuit. The closest I found was the Zamudio case. But the fact of the matter was that the statements were in. The jury was able to hear them, to make of them what they wanted to. And defense counsel was free to emphasize whatever points he thought necessary in order to make his case. His argument is that this one ruling cut the legs out from under the defense. But that simply cannot be true. Because the statements were in. There were opportunities to cross-examine Agent Jones, not by asking what did Mr. Wagner tell you, but just asking, for example, did he have PTSD? And asking her just directly what he wanted to, the particular facts that he wanted to emphasize. And I should also mention that even after the hearsay ruling, defense counsel was not unable to emphasize the points that he wanted. Because then he went on to ask and emphasize the very same points by simply, instead of saying, did Mr. Wagner say this or did Mr. Wagner say that? He just asked Agent Jones, did you ask Mr. Wagner this? Did you ask Mr. Wagner that? Well, at that point, though, counsel had been cut off, right? So he didn't have any choice at that point. Sure, but it was very similar ground that he was able to cover even after the ruling. And I guess I would just get back to the simple fact that defense counsel was able to emphasize whatever points he wanted to from the statements because they were in evidence already. Can I ask maybe it's a technical question also about the fact that the district judge appeared to rely on the hearsay rule, which arguably doesn't seem like a perfect fit here. Especially if he said it's not relevant, you know, your purpose is not relevant. But it seems to me that he was saying, well, it's hearsay. Well, theoretically, if defense counsel is cross-examining and really truly trying to contextualize the discussion, and I'll give you a hypothetical. I don't know if this was what he had in mind or not. But, you know, when Mr. Wagner said that in response to Agent Jones, well, are you saying that it was your wife that had that stuff from the illicit website? And he said, well, I'm not saying that. Well, you know, for example, question, did he appear to be disavowing that his wife had, you know, by his tone? Or did he seem just chagrined with your questioning? Well, that wouldn't be calling for hearsay, would it? I don't think so. I think those questions could have been posed. So there were legitimate areas of inquiry that he could have been asking on cross-examination to contextualize what the jury had been exposed to that wouldn't necessarily be hearsay, right? I think that's right, and I think the judge's ruling, therefore, didn't preclude him from asking those sorts of questions. And, in fact, as I understand it, he did do that, right? Correct. I mean, was he allowed to ask about topics that came up in the conversation? Yes, Your Honor. He then attempted to sort of change tactics and try and get at some of those issues and emphasize them in a different way without running up against the hearsay objection. But I agree with you, Judge Bachrach. It may be that perhaps hearsay isn't the best fit. Maybe it's not the best evidence to be asking the agent who is doing the interview to characterize or summarize what the statements were made that were out of court. But at the end of the day, I don't think it really matters, to be honest, because the evidence against Mr. Wagner was such that whether the ruling went either way, the outcome would have been the same. And before I get to the sufficiency of the evidence issue, Judge Mathison, I wanted to touch on the issue of Miranda and when the questioning became custodial. And our position is that it never was custodial. And I think the key indicators that this court has looked at to decide whether or when an interaction becomes custodial is, one, whether the person was informed that they were free to leave and could end the questioning or didn't have to answer any questions. The second is the tone and the length of the questioning. And the last is whether it took place in a context that was dominated by law enforcement. With respect to the first, one of the first words out of Agent Jones' mouth after she provided Mr. Wagner with the warrant, both to him and his wife, was, you are free to leave. You're not under arrest. But we'd like to ask you some questions. Is that OK? Yes, that's OK. The agents then retrieved a couple of personal items from Mr. Wagner, I believe a shirt and some shoes from the house, walked with Mr. Wagner out to a bench on his property. And there, not with six agents, but just two agents, Agent Jones and Agent Daniels, asked Mr. Wagner questions, questions about his Internet activity, about his family, about a number of different topics. And I guess the best thing I can do is just direct you to the audio that is part of the record in this case and just listen to it. It's very low-key. It's very conversational. It's not antagonistic or anything like that. I just have maybe one question. If I understand the argument on appeal, I think it goes to this context question and goes something like this, that there were six agents at the home. There were two agents doing the interview. They separated Mr. Wagner from his wife. There's an argument in the brief that they blocked the driveway. You may want to speak to that. I guess the inference being that how could it be free to leave if they're blocking the driveway? And then at some point, and I've listened to the audio, but at some point, Agent Jones does get a little more forceful and says to Mr. Wagner, spit it out. Why isn't this, taking the totality, a coercive context and raises a custodial interrogation question? So I think there are multiple reasons. One, again, the tone of the conversation, it wasn't really antagonistic. I'm not sure the part exactly that you're referring to. Is that the second part of the audio when they're in the house viewing the child pornography on the computer? It was my understanding things got more aggressive at that point. The conversation became more heated at that point, but to be clear, that portion of the audio was not played, and the jury never heard that. And so to the extent Mr. Wagner is saying that evidence should have been excluded because it was a result of a custodial interrogation, it just didn't come in. Is there any record support for the idea of the car blocking the driveway, the law enforcement cars blocking the driveway? I know that Mr. Wagner has said that the agent's vehicles came up into the driveway and that the driveway was blocked. I am not aware of any— Beyond him saying it, is there any— Not that I'm aware of, and I'm also not aware of any record evidence showing that they were denied permission to leave, that they ever asked to leave. And in any event, the record does show that this house in White City, Kansas, is out in the country. There's plenty of room. Even if Mr. Wagner couldn't have gotten in his car maybe and driven away, he could have walked away from the agents. And clearly, as the record does show, Mr. Wagner understood that he could cut off questioning at any point because he in fact did that when he was confronted with child pornography on his computer. He said, either read me my rights or get out of my house. And they said, I'm sorry, we're not reading you your rights because you're not under arrest, but you're free to go. And they also said, nor are we getting out of your house. That's right, because they had a valid search warrant for the house. The question of whether the interview was custodial, is that ultimately a question of law? Yes, I think it is. And I think if you look at this court's cases, for example, the Jones case. In that case, there were, I think, between two and four officers, I think it was either three or four officers, stop a person at a gas station, have her get into their car. There's an officer sitting in the passenger seat and in the back seat with her. There's an officer standing outside the car with her, and they're questioning her about the activity. And they're saying, we intercepted this package that you ordered that had drugs in it, and is this yours? Do you know anything about this? And this court held in that Jones case that that was not custodial interrogation. So if that's not custodial interrogation, then I certainly don't know how this could be. Judge Bacharach, did you have a question? No, no, I'm just questioning. So I think when you look at that case, and with respect to the separation from his wife, the cases that rely on isolating a person as a basis for finding custodial interrogation, most of those cases, for example, the Griffin case, are where two people are together. One is taken away inside a law enforcement center or office building, sort of scurried away into a small office where they're faced with direct and pretty critical questioning with the door closed. Maybe it's open, but it's very difficult to see how someone would feel free to leave in that context. Here, the questioning took place at Mr. Wagner's home. And his wife was within eyesight. That's my understanding, that she was on the porch, and Mr. Wagner was with the agents on benches in the yard. You said within your understanding. There wasn't any testimony from the agents. Not that I am aware of that she was within eyesight or that she saw them, but they weren't separated by walls or officers or anything like that is my understanding. Unless there are additional questions on the custodial interrogation, I'll hit on the high points of the sufficiency of the evidence. This investigation started, as Mr. Riddle indicated, with the NIT warrant. There was evidence that a person using the name Soldier Mike had logged into the Playpen website in late February, early March of 2015, and over about a two-week span had spent about nine hours on the site, which was basically dedicated almost exclusively to child pornography. That username was then tied to an IP address and also a computer name. The computer name was sfc underscore gunner. The IP address was then linked to Mr. Wagner's home address. On executing the warrant at the home, the agents found a laptop computer by the name of sfc underscore gunner. On that computer, after forensic investigation, it was found that there were more than 4,000 images and videos of child pornography that had been compiled over years and had been viewed as recently as just a week before. So with respect to the argument that it could have been anyone doing this, it seems hard to believe that over that period of time, where Mr. Wagner said that no one had been living in their house for a long time, that someone had gone into their house the week before to view child pornography, and it wasn't Mr. Wagner. In addition to that, in reviewing the contents of the laptop computer, agents found at least three sequences where several usernames were used close in time together, suggesting it was the same person using each of those. Those usernames were sfc underscore Wagner at yahoo.com, Mike Jenkins at yahoo.com, which was the email address tied to the Soldier Mike username. And then the Soldier Mike username. And so with that, in one of the situations, the sfc underscore Wagner at yahoo.com username engaged in a chat looking for images of 8- and 10-year-old girls. Now I should add at this point, Mr. Wagner told the agents that he had been in the military and that when he left the military, his rank was Sergeant First Class. SFC is a common acronym for Sergeant First Class. Okay, so that's in the record that he told the agent that. Yes. Well, nobody seemed to make much of that in the trial or otherwise in connection with putting that before the jury that he was a Sergeant First Class. I see my time is up, but may I ask? Yes. So that was put before the jury. I agree that that specific point may not have been emphasized, but it was certainly part of the record that that was his rank. Because it would have been part of the tape that they heard? It was part of the tape that they heard, yes, Your Honor. Okay. So unless there are further questions, I'd be happy to sit down. Thank you for your time. Thank you. Thirty seconds if you want it. Thank you, Your Honor. Just briefly on the sufficiency of the evidence argument, the government was very clear in the very beginning of its opening or its closing statements, closing argument to the jury, that this was a case about circumstantial evidence. Now, I certainly understand convictions can be based on circumstantial evidence, but here the circumstantial evidence was really nothing more than speculation. And in particular, the direct evidence we had from the two government witnesses very quickly was Agent Jones testified that as of September 17th of 2015, when the government came to the House, the FBI did not know who was using those computers to access the Playpen website. And even after the forensic analysis by Ms. Amy Corrigan, she testified on both direct and cross-examination that her forensic analysis could not put Mr. Wagner at the controls of that computer at any time. That's the evidence that the jury had was that we don't know who did it. And the knowledge was the essence of this case. Thank you, Counsel. Thank you for your arguments. They were helpful. Court is in recess.